# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

---

| | |
|---|---|
| YIDAM, LTD., a Colorado partnership | Case No. |
| Plaintiff | |
| v. | |
| ANIL DIWAN, an individual residing in the State of Connecticut, individually and in his capacity as an officer of the Nominal Defendant; and EUGENE SEYMOUR, an individual residing in the State of California, individually and in his capacity as an officer of the Nominal Defendant, | **SHAREHOLDER DERIVATIVE COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants/Counter-Plaintiffs, | |
| and | |
| NANOVIRICIDES, INC., a Nevada corporation, | |
| Nominal Defendant. | |

---

## I.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, Yidam, Ltd., ("Yidam") is a limited partnership organized under

the laws of the State of Colorado and has its principal place of business located in the

**SHAREHOLDER DERIVATIVE COMPLAINT** – Page 1

State of Colorado. Each of Yidam's general partners, as well as each of Yidam's limited partners, are residents domiciled within the State of Colorado.

2.     Yidam is presently a shareholder of NNVC and was a shareholder of NNVC at the time of the continuing wrong complained-of in this Complaint. Plaintiff first became a shareholder of NNVC in 2007. As of the date this action was filed, Plaintiff owned approximately nine hundred thousand shares (900,000) shares in NNVC. Plaintiff was a shareholder of NNVC at all times during the six months immediately preceding the demand for inspection described herein. Once Plaintiff became a shareholder, it has continuously been a shareholder to the date this action was filed. Plaintiff has standing to bring the present action.

3.     Nominal Defendant NNVC is a publically-traded company that develops nanotechnology for the development of biomimetic and anti-viral medicines. NNVC is incorporated in Nevada, with business operations being conducted throughout the United States, and having its principal place of business located at 135 Wood Street,      Suite 205, West Haven, CT 06516.

4.     Defendant Eugene Seymour is NNVC's Chief Executive Officer and is on the Board of Directors. Defendant Seymour is believed to be a resident of, and having his principal place of domicile in, the State of California.

5.     Defendant Anil Diwan is the company's President and Chairman of the Board of Directors. Defendant Diwan is believed to be a resident of, and having his

**SHAREHOLDER DERIVATIVE COMPLAINT** – Page 2

principal place of domicile in, the State of Connecticut and may be served with process at his principal place of business located at 135 Wood Street, Suite 205, West Haven, CT 06516, or wherever he may be found.

6.      Defendant Seymour and Divan are collectively referred to herein the "Defendants." At all times relevant to this Complaint, the Defendants held the positions described above.

7.      The United States District Court for the District of Colorado has original jurisdiction over this action under 28 U.S.C. § 1332(a)(1). Original diversity jurisdiction exists because (a) the amount in controversy exceeds the sum or value of $75,000.00, as demonstrated in both the Statement of Facts, *supra*, and the Prayer for Relief, exclusive of interest, attorneys' fees and costs of suit, and (b) the action is between citizens of different states.

8.      Venue is proper in this Court because the injuries alleged by Plaintiff herein took place in the State of Colorado.

### III.

### STATEMENT OF FACTS

9.      NNVC is a publically-traded corporation organized under the laws of the State of Nevada. NNVC develops anti-viral nano-biopharmaceuticals. Plaintiff is, and at all times relevant to the facts alleged in this Complaint, was a shareholder of NNVC.

**SHAREHOLDER DERIVATIVE COMPLAINT – Page 3**

10.   Plaintiff, through its General Partner, The CIMS Group, Inc. ("CIMS") and its principal, Mr. Brian Bramell, played an instrumental role in the early stage success of NNVC. Specifically, and in addition to details identified elsewhere in this Complaint, Plaintiff directly facilitated $2,250,000 in equity investment in NNVC between 2007 and 2009 and provided significant advising and consultation between 2005 and 2011 at the request of Defendants Seymour on strategy that directly benefitted NNVC.

11.   Plaintiff has legitimate concerns about the lack of proper corporate governance of NNVC by its directors and officers and, what Plaintiff alleges upon information and belief to be, breaches of fiduciary duty, failure to abide by NNVC's own bylaws and other corporate governance requirements, and improper self-dealing by certain directors and/or officers of NNVC. In addition, Plaintiff (among other shareholders of NNVC) has suffered losses caused by (a) diminution in share value that is, upon information and belief, alleged to be the result of malfeasance by Defendants, and (b) improper usurpation of company resources by the individual Defendants. These concerns, which are serious enough to compel any diligent shareholder to investigate further, include the following:

a.   The Board of Directors is not Independent and was not properly elected: The bylaws of the Company specifically state that "A meeting of the stockholders for the purpose of electing directors...shall be held annually at 10 A.M. on November 1, or at such other time on such other

day as shall be fixed by resolution of the Board of Directors." In stark contrast to this clear requirement, NNVC did not call a properly noticed meeting of the stockholders during the first **seven years** of the Company's existence. The Bylaws of the Company further specifically state that "Directors shall be elected at the annual meeting of the stockholders…." Despite this requirement in the Bylaws NO properly called meeting of the stockholders was held in the first **seven years** of the Company's existence for the purpose of electing Directors. NNVC Board member Eugene Seymour, is the company's Chief Executive Officer and is not an independent Board member. Seymour was hand selected by Diwan to serve his needs at the expense of the Company and its shareholders and was never elected at a properly called stockholder meeting. Diwan, NNVC's President is not an independent Board member and during the first seven years of the Company's existence was never elected at a properly called stockholder meeting. Furthermore, only since Plaintiff has made demands upon NNVC for corrective action has NNVC finally appointed a third member to the Board of Directors. Yet this Director was also NOT elected at a properly called stockholder meeting.

b. NNVC's relationship with TheraCour: NNVC does not own the intellectual property and patents to the drugs that are under development by

the company. Rather, the intellectual property and patents are held by an entity named "TheraCour". NNVC has a licensing agreement, which is the entire basis for NNVC's existence. Defendant Diwan is the CEO and a Director of TheraCour. Diwan also owns approximately 70% of the outstanding capital stock of TheraCour. Anil Diwan with 70% ownership in TheraCour has both investment and dispositive power over the Nanoviricides shares held by TheraCour. Dr. Diwan as President and Chairman of the Board of NNVC, is able to control both entities, Plaintiff alleges that NNVC has permitted Dr. Diwan to engage in self-dealing transactions that benefit his interests and are detrimental to NNVC and its shareholders. In effect Diwan is in a position to totally dictate the terms of any deal between NNVC and TheraCour. This situation creates an undeniable conflict of interest. Simple math demonstrates how pervasive the conflict. As a 70% owner of TheraCour Diwan receives 70 cents of every dollar diverted from NNVC to TheraCour. Yet (at the time of the Company's formation) Diwan from his control of TheraCour's NNVC stock and his NNVC stock would only receive 32 cents of every dollar not diverted to TheraCour. Diwan's benefit from a dollar diverted to TheraCour is 220% greater than his benefit from a dollar not diverted. Today Diwan would only receive 25 cents out of every dollar not diverted to TheraCour.

An example of these self-dealing transactions includes NNVC's original license agreement that was signed by Diwan on Behalf of TheraCour and signed by Leo Ehrlich the CFO of NNVC on behalf of NNVC. Yet on information and belief Ehrlich is also a 10% owner of TheraCour. At the time of the agreement Ehrlich owned 5.62% of NNVC. Ehrlich (who signed for NNVC) benefit from a dollar diverted to TheraCour is 178% greater than his benefit from a dollar not diverted. The Company claims that a consultant evaluated the license agreement and reported that it was fair, equitable and in line with industry standards. Plaintiff has been requesting a copy of that report since 2008. Defendants said they would provide a copy of that report (see emails attached and incorporated hereto), yet Plaintiff has never received a copy and Defendants are now refusing to provide a copy of that report. This license agreement was not an arm's length transaction, is not in line with industry standards and benefits TheraCour and as such Diwan and Ehrlich at the expense of stockholders. The NNVC-TheraCour relationship is inherently unfair and has been wrongly used to divert shareholder value from NNVC's shareholders to Diwan.

c.    Abuse of Plaintiff's Funding: In September of 2007 and again in September of 2009 Plaintiff and its close associates funded the company by

way of a private placement and warrant conversion for the purpose of developing the Company's drug candidates. In April 2007 the Company entered into an agreement with Walter Reed to develop a cure for Dengue Fever. Plaintiff funded that project and the Company during its completion. In February 2008, the Company entered into an agreement with USAMRID to develop a cure for Ebola, Marburg. Plaintiff funded that project and the Company during its completion. In March of 2008 the Company entered into an agreement to develop a cure for Viral Epidemic Keratoconjunctivitis. Plaintiff at el funded that project and the Company during its completion. Plaintiff later learned that NNVC did not have a license agreement with TheraCour before it started to develop these drugs. Plaintiff discovered this fact when its General Partner, The CIMS Group, Inc ("CIMS") was asked by Defendant Seymour to assist in positioning NNVC in obtaining funding needed to purchase the additional licenses from TheraCour. This was Plaintiff's first indication that work had been conducted for the benefit of the Diwan without first obtaining the rights to license the drugs in question. It was not until February 15, 2010, that NNVC executed an Additional License Agreement for these technologies and after the drugs were developed by NNVC. All the value added was done by NNVC before terms were negotiated. At that point the Company

had to go hat in hand to Defendant Diwan to request the license for drugs for which Plaintiff had already had paid for the testing and development. This backward, self-dealing transaction benefited Defendant Diwan to the expense of NNVC's shareholders. Defendant Diwan on behalf of TheraCour demanded 7,000,000 shares of a newly created Series A Preferred Stock. This entire agreement was negotiated between Defendant Diwan as 70% and President of TheraCour and Defendant Diwan as the largest shareholder in NNVC, President of NNVC, Chairman of the Board of NNVC and one of only two Board members of NNVC. Full disclosure of the details of these transactions were not provided to, or approved by, the shareholders. Plaintiff further alleges that the Board of NNVC, to the extent it condoned these self-dealing transactions, breached its fiduciary duties to the shareholders of NNVC.

d.   <u>Manipulation of Preferred Stock:</u> On March 18, 2009 the Articles of Incorporation for the Company were amended to create a class of "blank check preferred stock". 20,000,000 million shares of "blank check preferred stock" were authorized. The Company acknowledged that the amendments required stockholder approval and yet the shareholders at large did not receive prior notice of the proposed amendments, no stockholder's meeting was held and the stockholders at large were not invited to vote. Instead the

amendments were approved by written consent of the directors and insider stockholders. On February 15, 2010 the Board, **comprised solely of two directors, Defendant Diwan and Defendant Seymour** used 10,000,000 of the "blank check preferred stock" to create 10,000,000 shares of "Series A Preferred Stock". Series "A" shares were stated as convertible at four shares of common stock for every one share of Series "A" stock. On that same day the Company entered into the above referenced License Agreement and issued TheraCour the aforementioned 7,000,000 shares of the newly created Series A Preferred Stock. The company reported the transaction in its 10-K reports for the reporting period ending 2010-06-30 and 2011-06-30 and yet falsely reported the conversion rate to shareholders as two shares of common stock for every one share of Series "A" stock. This would have meant that TheraCour could have converted its 7,000,000 shares into 14,000,000 shares of Common Stock. However, Series "A" stock was in fact convertible at the rate of four shares of common stock for every one share of Series "A" stock and as such TheraCour was actually entitled to 28,000,000 shares of Common Stock. The Company then reported in the 2012 10-K that it had reduced the conversion rate to 3.5 shares of common stock for every one share of Series "A" stock. What was reported to shareholders as a reduction was actually an increase from the

prior report of a 2 for 1 conversion to a 3.5 for 1 conversion. In effect Defendant TheraCour will be entitled to receive 24,500,000 shares of common stock for the rights to drugs, which Plaintiff paid to develop before the license was granted. Further, Defendant Diwan arranged for the shares to be price for tax purposes at their par value of $7,000. **Upon conversion (at NNVC's current stock price) the stock will be worth over $12,000,000 to TheraCour.**

e.    Usurping of Voting Control: Yet even more insidious than the stock awarded as part of this agreement is the theft of voting control of the company that has occurred. The Class "A" stock granted as part of the agreement also carried a voting right of four votes for every share thus giving TheraCour 28,000,000 additional votes. But beyond this on June 15, 2012 the defendants deviously increased the voting rights from four (4) votes per share of Preferred "A" stock to an astonishing nine (9) votes per share. This increased TheraCour's Preferred "A" voting rights by 225% to 63,000,000. In addition to that, Diwan voted himself a compensation package, which included him receiving 250,000 shares of Preferred "A" stock each year from 2009. As of 2013 he has thus accrued an additional 1,000,000 Preferred "A" shares giving him 9,000,000 additional voting rights. As a result Defendant Diwan has added a total of 72,000,000

Preferred "A" votes to his already existing 40,242,200 of common stock votes that he and TheraCour control. With exercisable warrants this mean Defendant Diwan alone now controls over 112,000,000` shares' worth of voting power within the company. At the same time defendant Seymour received a compensation package, which included him receiving 250,000 shares of Preferred "A" stock each year from 2009. As of 2013 he has thus accrued an additional 1,000,000 Preferred "A" shares giving him 9,000,000 additional voting rights. Add this to the 8,000,000 common shares already owned by Seymour or by gift to his immediate family and Seymour now controls 17,000,000 voting rights. By **using Preferred "A" stock defendants Diwan and Seymour have increased their voting rights in the Company from about 30% to 54%**. In so doing they have stolen voting control of the company and now have absolute dictatorial power over the Company. Upon information and believe, Plaintiff alleges that the only plausible rationale for two fiduciaries of the Company to vote themselves Preferred "A" class stock (that results in an increase from 30% of the company's voting rights to 54%) is to seize total voting control of the company. **In real terms the officers and directors have been slowly and methodically stealing voting control of the Company for their own self-dealing pursuits.**

SHAREHOLDER DERIVATIVE COMPLAINT – Page 12

f.     Abuse of Executive Compensation Programs: In the 10-K filings made with the SEC, NNVC discloses, "The Company's executive compensation program for the named executive officers (NEOs) is administered by the Board of Directors. The Board of Directors makes independent decisions about all aspects of NEO compensation,..." Defendants Diwan and Seymour are the only members of the two member Board of Directors. So when these executives were granted four (4) year compensation packages the only two members of the Board of Directors were the two executives receiving these compensation packages. As noted above these packages have granted Defendant's Diwan and Seymour Preferred "A" stock with a voting right of nine (9) votes for every one (1) share. In addition they have awarded themselves pay increases and bonus programs based on poorly defined goals and actions contrary to the best interests of the shareholders. All compensation to the two Defendant officers is done without the benefit of an independent compensation board or any independent review.

g.     Conflicts of Interest Between Common Stockholders and Preferred Stockholders: Defendants Diwan and Seymour have granted themselves compensation packages and their affiliates contractual relationships that put their interest in substantial conflict with those of the shareholders they

supposedly represent. Preferred "A" stock is convertible upon the sale of the Company. While it may very well be in the best interest of the stockholders to maintain the Company and collect royalties, or to sell drugs for a revenue stream; Diwan and Seymour stand to increase the number of shares they own in the Company by a combined 32,500,000 shares if they sell the Company. Without any doubt this puts their interest in conflict with those of the shareholders. And this situation will only get worse as they continue, unrestricted, to award themselves employment compensation with lucrative Preferred "A" stock previsions.

h. <u>NNVC's Manufacturing Facility</u>: NNVC, under the control of Dr. Diwan, apparently determined that NNVC required a cGMP-compliant[1] manufacturing facility and announced a planned lease of space with an option for a future purchase from an entity known as Inno-Haven, LLC ("Inno-Haven"). Upon information and belief, Plaintiff alleges that this transaction was overseen by Dr. Diwan's personal attorney, who represented both Dr. Diwan and NNVC. Inno-Haven is owned or controlled by Defendant Diwan. The lease will be funded through a sale of NNVC stock and favors Dr. Diwan personally at the expense of NNVC and its shareholders. In mid 2009, a small group of insiders voted without even notifying the shareholders at large in advance or soliciting their vote to

---

[1] cGMP is a drug industry term that means "current good manufacturing practices."

allow Defendant Diwan to sell some of his shares and use the proceeds to purchase a building. The building was purchased on August 31, 2011. On May 14, 2012 the Company announced that it had retained the services of Mr. Andrew Hahn to help with the overall design and construction of its laboratory and cGMP pilot production facility. In so doing the Company has abandoned all other building prospects and has diverted all its energies and its resources to developing the building owned by Defendant Diwan. However, upon information and belief the Company does not have a lease with Diwan for the building. **The Company is once again spending resourses to develop assets owned by Diwan before establishing the terms and costs it will incur to lease the building.** At some point in the future the Company will be forced (once again) to go "hat in hand" to Diwan and negotiate a lease. This will of course be done after the Company has abandoned all other options and has gone to considerable expense to develop Diwan's asset. No matter what Defendant Diwan demands as rent, **NNVC will be forced to comply or miss critical deadlines for its FDA submissions and abandon its substantial investment made for Diwan's asset. Diwan will be in a position to dictate terms and with Seymour will have dictatorial vote in the Company to control the terms of the lease.** Once again every dollar diverted by Diwan from the Company to the

building will accrue predominately to his own self-interest, while he will only benefit about $0.25 for every dollar not diverted. The building purchase and future lease to NNVC will favor Dr. Diwan personally at the expense of NNVC and its shareholders. In the Company's 10-Q report, filed February 14, 2013, the Company reports that it has entered into a Memorandum of Understanding "MOU" with Inno-Haven. While this MOU calls for the Company to provide up to $2,500,000 of collateral to complete the build-out of Defendant Diwan's building, it specifically states it does NOT include any agreement as to rent, taxes, utilities, maintenance, and other related expenditure. The disclosure of the lease is critical to determining whether the lease is predicated upon terms that are fundamentally fair and that the transaction is arms-length in nature. Upon information and belief, Plaintiff alleges that Defendant Diwan is putting the company in a position of total commitment to his building without the benefit of a lease or terms of a lease. Diwan will then be in a position to dictate terms of a lease inferior to other deals for that building or other facilities that could have been utilized on similar (or better) terms and that would not benefit Dr. Diwan personally. This self-dealing is alleged to transgress the customary boundaries of the business judgment rule.

i.   <u>Failure to Pursue Investments Prudently</u>: NNVC has systematically failed to pursue advantageous sources of funding that would have enabled NNVC to pursue its business in a timely and prudent manner with less dilution to existing shareholders. NNVC filed a Form 3 Shelf Registration with the Securities and Exchange Commission ("SEC"), which was declared effective by the SEC on April 29, 2010. On May 12, 2010 NNVC entered into an agreement with Seaside 88, LP ("Seaside"), and then NNVC issued Series B Preferred Stock to Seaside. Series B Stock is convertible to common stock every two weeks based on a conversion formula derived from the ten (10)-day daily volume weighted average of actual trading prices. It also pays a dividend on unconverted shares at a 10% annualized rate. This financing transaction created a substantial dilution of the existing shareholders and put extreme downward pressure on the stock as large volumes of stock were continuously brought to market. NNVC entered into the Seaside agreement even though NNVC's directors and officers were aware of alternative funding that was available without dilutive conversion formulas and without the obligation to pay a 10% dividend. They also knew that the stock would have been purchased by long-term NNVC shareholders, which would minimize short-term impact on shareholder value and dilution of existing NNVC shareholders.

Plaintiff's General Partner, CIMS participated in arranging an alternative financing opportunity to NNVC. NNVC was presented with this financing yet failed to even investigate the opportunity, despite the fact that CIMS had a demonstrated history of making introductions that resulted in financing. For example, in September of 2007 CIMS introduced NNVC to investors who ultimately invested $1,750,000.00 in NNVC common shares. In September of 2009 CIMS introduced NNVC to investors who ultimately invested $500,000.00 in NNVC common shares. In addition on numerous other occasions CIMS was capable of providing introductions, but NNVC (at Defendant Diwan's bidding) refused to meet even minimum requests for disclosure in order to achieve the needed financing. For example, in an e-mail dated May 28, 2009 CIMS asked about the details of Diwan's and TheraCour's compensation and licensing agreement; investors wanted to know if it was congruent with industry standards. Seymour responded to CIMS that in fact a consultant had been hired to evaluate the deal and he promised to provide a copy of the report. In an e-mail dated July 1, 2008 CIMS' principal, Brian Bramell, clearly outlined three reasonable conditions necessary to raise funds, which were 1) that he needed to see the licensing agreement; 2) he needed to see the consultant's report; and 3) he need my position on the board formalize. In an e-mailed date June 2, 2008

CIMS' principal, Brian Bramell, wrote: "have we seen the consultant's report yet?" Seymour replied to that e-mail by saying: "Awaiting consultant's report." Despite numerous requests and promises to produce a consultant's report has never been made available. As a result of this refusal to meaningfully engage with CIMS, and NNVC's failure to appoint an independent Board member, investors introduced by CIMS chose not to invest thereby causing NNVC to lose investment opportunities on terms that were less dilutive than those ultimately chosen by Defendants Seymour and Diwan. Since none of the reasonable requests were honored on July 9, 2008 CIMS was forced to e-mail Seymour the following: "Just and FYI for you...I do not believe that any of my guys intend to convert." True and correct copies of this e-mail correspondence are attached and incorporated hereto as Exhibit "A". Defendant Seymour at all times was well aware that CIMS could help secure the financing that was often so desperately needed during the Company's growth and that CIMS was able to deliver the financing in question. In an e-mail dated February 7, 2009 CIMS' principal, Brian Bramell, wrote: "Could have had you $7 million....Anil said "no"." Seymour responded to that e-mail forty minutes later and said: "Don't rub it in!" In an e-mail dated May 6, 2009 and in response to a new financing proposal from Seymour, Brian Bramell wrote: "I had to laugh ...I had

$7,000,000 for NNVC at $1 per share or $7,000,000 shares. But Anil screwed me. Now that same $7 million is going to cost him 14 million shares plus 14 million warrants..." Seymour acknowledged the e-mail about an hour later and did not object to Mr. Bramell's comment. On July 9, 2008 Seymour wrote in an e-mail that he "Finally figured out why Anil has been pushing back about. Attorney on my side and we will work him. I'll explain on the phone when ur home." True and correct copies of this e-mail correspondence are attached and incorporated hereto as Exhibit "B". During the telephone conversation between Mr. Bramell and Defendant Seymour that followed, Defendant Seymour explained Defendant Diwan's paranoia as described elsewhere in this complaint, specifically Seymour represented to Mr. Bramell that Diwan did not want CIMS to be further involved with the company because he felt CIMS was trying to take things away from him and that he felt that CIMS's questions about the licensing agreement were meant to take benefits he had received under the agreement away from him as they were not fair and of market value. As a result Diwan refused to cooperate with CIMS in any other funding efforts. In early 2010 NNVC was again in need of funding and Seymour approached CIMS for help. On or about April 7, 2010 CIMS informed Seymour that they had obtained a verbal commitment for up to $20,000,000.00 in financing in

return for Common Stock with a 144 restriction, subject to terms acceptable to the investors. On April 21, 2010 Seymour e-mailed to CIMS a "Basic Investor Presentation April 2010 mod.pdf. In an email dated April 25, 2010 CIMS wrote: "How are we doing with the term sheet and other issues?" Seymour responded: "Friday they said that they have "no comments" so we're very optimistic about this week. Not allowed to talk terms until we go effective". True and correct copies of this e-mail correspondence are attached and incorporated hereto as Exhibit "C". Despite this commitment of funding, Diwan refused to pursue this far superior financing from a proven source. **NNVC accepted financing by selling Series B Preferred Stock which was convertible and sellable almost immediately and carrying a 10% interest; and rejected financing by selling Common Stock with a 144 restriction; a move that reflects the poor business judgment and disregard for NNVC's shareholders, presumably to avoid accountability by Defendants Diwan.** CIMS was informed of the transaction by an angry investor colleague who while monitoring NNVC news releases discovered the May 12, 2010 announcement of the incredibly inferior financing. In addition, and according to NNVC's Form 10-K filed with the SEC, "On March 3, 2010, the Company entered into employment agreements with its two executive officers, Eugene Seymour, Chief

Executive Officer and Chief Financial Officer and Anil Diwan, President and Chairman of Board. Both agreements provide a minimum annual base salary of $250,000 for a term of four years. In addition, Dr. Seymour and Dr. Diwan are eligible for an increase in base salary to $275,000 if the Company consummates a financing with gross proceeds of at least $5,000,000." Diwan and Seymour each get a $25,000 annual increase in salary with absolutely no requirement for the financing to be of fair market value or to exercise basic fiduciary duty. No shareholders' meeting was held to solicit input and no shareholders' vote was taken. At such a shareholders meeting alternative financing proposals could have been presented. As a result of management's failure of fiduciary duty and improper self-dealing the company's stock has lost nearly 80% of its value (translating into a loss of approximately $290,000,000 in shareholder equity) since the announcement and implementation of the above reference financing arrangement. Upon information and belief, Plaintiff alleges that the approval of these deals required a vote of a percentage of the shareholders that was not secured in conformity with the NNVC articles of incorporation and/or by-laws. Plaintiff is entitled to these documents as a matter of law under Nevada Revised Statutes ("NRS") 78.105 but has been intentionally and systematically denied access to these documents. Once

Plaintiff is granted access to these documents, further amendments to expand and/or restrict the scope of the causes of action made in this Complaint will be made.

j.      Disregard for corporate formalities and shareholder meetings and voting procedures:   Upon information and belief, Plaintiff alleges that NNVC has failed to hold a shareholders' meeting to consider and vote on the transactions set forth above. Upon information and belief, Plaintiff alleges that the Board has avoided calling shareholder meetings because the Board knows it would not be able to obtain sufficient votes to approve these transactions and intentionally chose to disregard the requirement of calling such meetings.   In the alternative, upon information and belief, Plaintiff alleges that NNVC has stated to shareholders that there is no need to obtain shareholder vote because they have sufficient votes to act on Company business without seeking the vote of all shareholders but that such representation is false because upon information and belief, Diwan, Seymour and TheraCour are the only insider shareholders and since Diwan, Seymour and TheraCour only control approximately 34% of the outstanding shares; they are either misleading shareholders or they are including, in these votes, entities that have not been identified as insiders. In so doing they are providing insider information to a select group of

individuals with access to insider information as part of the voting process. For instance, Leo Ehrlich ("Ehrlich") was the former CFO of NNVC. Upon information and belief, Plaintiff alleges that Ehrlich, his wife and daughter own (or at one point in time did own) in excess of nine-million shares of NNVC stock. Upon information and belief, Plaintiff alleges these other interests may provide additional voting power but have not been properly disclosed. As an example that exclusion of non-insider shareholders is a stated objective and policy of NNVC and as another example of management's blatant distain for shareholders; in an email dated June 18, 2008, Seymour attempted to convince CIMS to get its investor friends to give their proxy to CIMS who will then get a letter from Defendant Seymour. In the e-mail, Defendant Seymour gives his reason as "We want to avoid having to go to shareholders everytime we need something." True and correct copies of this e-mail correspondence are attached and incorporated hereto as Exhibit "D". Upon information and belief, Plaintiff believes that this course of dealing reflects Defendants' intent to avoid disclosures to and seeking shareholder consent for major business decisions, including those that are alleged in this Complaint to be improper. The NNVC Board of Directors has failed to make full disclosure of potentially self-interested transactions by NNVC directors and officers to

the shareholders, and instead the Board has worked for the best interests of insiders and large shareholders to the detriment of minority shareholders. The Board failed to seek shareholder input and vote for a) its astonishing decision to finance the Company by selling Series B Preferred Stock instead of Common Stock with restriction, b) it's decision to allow Defendant Diwan to buy a building and lease it to NNVC with no disclosure of alternative proposals, c) its decision to enter into a license agreement with TheraCour bases on extravagant terms and without disclosing the purported consultant's report, d) it's decision to enter into an additional license agreement with TheraCour for rights to drugs that NNVC had already paid to develop and granting TheraCour 7,000,000 additional shares representing 63,000,000 additional voting rights, e) it's decision to provide compensation packages to themselves as both the two voting Board members and executives receiving the benefits. Benefits which include 2,225,000 additional voting rights each for each year of their employment, f) an incentive program for each of the Board members with no requirement to exercise basic fiduciary duty. It should be noted here that NNVC finally appointed a third member to the Board of directors. What is more telling is that this purported independent member was appointed five (5) years after NNVC committed to adding a third member and only after each of the

above mentioned actions had been completed to the exclusive benefit of the original Board members. Even if management controls enough voting stock to dictate all corporate decisions, shareholders' meetings would have at least brought to light these insider and self-serving transactions. By refusing to hold shareholder meetings the Board is demonstrating a blatant and premeditated cover-up of these abuses of executive power. NNVC's, Seymour's and Diwan's actions minimize shareholder rights and favor insiders at shareholder expense.

k.   <u>Securities Fraud Upon Plaintiff and Plaintiff's Affiliated Investors.</u> In or around mid-2007, NNVC was attempting to raise capital under a Private Placement Memorandum ("PPM"). As part of its ongoing work product with NNVC, CIMS approached several of its investor contacts with the PPM to determine interest in investing in NNVC. The investor group was concerned about the lack of an independent member on the NNVC Board of Directors. As a condition of their investment, these investors were assured by Defendant Seymour that an independent shareholder would be appointed to the Board and specifically that person would be Brian Bramell. Defendant Seymour confirmed this fact in an e-mail dated August 8, 2007 to Mr. Bramell, stating: "Brian I am starting the process to put you on the BOD. Do you have a resume? Gene" Based on these assurances,

Plaintiff and investor contacts of CIMS invested $1,750,000.00 in NNVC under the PPM in September of 2007. A true and correct copy of this e-mail is attached and incorporated hereto as Exhibit "E". NNVC and its directors/officers subsequently failed to honor their commitment to appoint Mr. Bramell to the NNVC Board of Directors. In an e-mail dated June 19, 2008 sent at 6:34 a.m., Mr. Bramell complained to Defendant Seymour that he had not yet been appointed to the Board of Directors. CIMS stated: "That is a renege on a commitment I had... that I was on the Broad... and a condition of my investors investing in the last round." Defendant Seymour responded to Mr. Bramell approximately one hour later (June 19, 2008 at 7:45 a.m.). In his e-mail, Defendant Seymour did not refute Mr. Bramell's claim that its investors invested on the condition that Bramell was appointed to the Board and in fact confirmed the agreement with the following statements, "You WILL be on the Board (emphases original); **I want you on the Board; You are very valuable to me and the Company**." A true and correct copy of this e-mail exchange is attached and incorporated hereto as Exhibit "F". Subsequently, in 2009 NNVC was once again desperate for funding to continue operations. Defendant Seymour again approached CIMS to solicit its investor friends to put more money into NNVC. Defendant Seymour provided further assurances that he

SHAREHOLDER DERIVATIVE COMPLAINT – Page 27

was close to getting Defendant Diwan to agree to honor his earlier commitment to put Mr. Bramell on the Board of Directors. Most of CIMS' investor contacts refused to provide additional funding due to the failure of NNVC to honor previous commitments. However, in late September and early October 2009, Plaintiff and one of CIMS's investor friends provided $500,000.00 in additional funding based upon the explicit promise from Defendant Seymour that Mr. Bramell would be appointed to the Board "if only Anil could be shown that they had provided the further investment". Once again, NNVC and its directors/officers refused to honor their commitment once funding had been obtained. **Plaintiff explicitly reserves the right to amend this Complaint after discovery has been conducted to include a cause of action for securities fraud against NNVC and its directors/officers alleging securities fraud.**

1. <u>Circumstances Relating to Insider Information and Improper/Misleading Disclosures</u>: Upon information and belief, Plaintiff alleges that NNVC provided confidential (i.e. insider) information to a Mr. Pat Cox. Mr. Cox writes a newsletter called *Breakthrough Technology*. Upon information and belief, Mr. Cox obtained information about future plans and opportunities of NNVC that were not disclosed to NNVC's shareholders or the public at large. Mr. Cox used this inside information in

advertisements promoting his newsletter with the catch phrase "One Tiny Company Approaching The FDA's Most Lucrative Loophole." Mr. Cox wrote about NNVC and disclosed the inside information to his subscribers in his Breakthrough Technology newsletter. Mr. Cox's February 11, 2010 article resulted in the stock surging from about $0.95 to $2.50 per share, followed by a collapse to around $1.00 per share. The publisher of *Breakthrough Technology* is Agora, Inc. of Maryland. Upon information and belief, Plaintiff alleges that the Securities and Exchange Commission has initiated proceedings against Agora, Inc. relating to fraudulent use of insider information. Upon information and belief, Plaintiff alleges that NNVC was aware of the of Agora's fraudulent activities before providing them with the inside information, yet chose to provide information which assisted Agora, Inc. in hyping the stock. Further inside information has been published in reports on an internet blog known as "iHug." One of the bloggers on the site is known as "Dr. Feelgood", who has spent an unusual amount of time commenting about NNVC. The postings reveal that Dr. Feelgood has a direct source to inside information, and these same postings appear to be used to hype NNVC stock. NNVC claims that they know who Dr. Feelgood is, but have no control over him. However, Dr. Feelgood's posts often quoted Seymour directly. For example, in a post dated

December 3, 2011 Dr. Feelgood posts a note about the details of Seymour's gift of stock to his children and then claims "From Dr. Seymour with his permission." In a post dated June 20, 2011 Dr. Feelgood states "Just spoke to Dr. Seymour about the facility." He goes on to relate details not disclosed to the general public. In a post dated December 3, 2011 Dr. Feelgood states and speaking about Seymour's family "I know all the people involved and their relatives. Over the past 6 years I've met them and gotten to know entire family. That is my connection to the information regarding insiders." And in a post dated June 23, 2011 Dr. Feelgood clearly demonstrates his knowledge of the impact his posts have on the share price. He states "There is this notion that boards such as this one and Yahoo have no impact on price. That's ridiculous. This board has 90 followers and according to iHUB ADMIN each board mark represents between 10 and 15 others who follow the board. That means that any given day, between 900 and 1500 iHUB members read this thread. To say what is posted has no impact on share price is either ignorance or disingenuousness." True and correct copies of these posts are collectively attached and incorporated hereto as Exhibit "G". The disclosure of inside information reveals – at the very least – a failure of internal controls at NNVC. Further, In NNVC's 10-Q filing for the period ending March 31, 2012 under "Legal

Proceedings" and referring to Plaintiff's Complaint Case No. A-12-654437-B; the Company states that "On April 9, 2012, the court dismissed the Complaint for failure to state a Claim for which relief could be granted." The true facts, supported by the court's own docket and minute entry on the matter in case A-12-654437-B on March 20, 2012, clearly states: "COURT ORDERED, request for Voluntary Dismissal is GRANTED. Both sides to bear their own attorney's fees and costs. Court directed the Demand be served upon the resident agent so that it can be appropriately addressed by the Board of Directors. If they fail to address it, counsel may file any additional claims that they think are appropriate. Mr. Guenther inquired regarding initial costs of filing the lawsuit in Business Court. Court reiterated its ruling and advised counsel could file a Memorandum of Costs." The court only responded to Plaintiff's request for Voluntary Dismissal. This statement further demonstrates NNVC false, misleading and often fraudulent statements made to shareholders, potential investors and vendors.

12. **Refusal to Make Statutorily-Mandated Disclosures of Corporate Records.** NNVC failed to include the original articles of incorporation and bylaws despite representations in the Forms 10-K and 10-Q filed by NNVC that represents those docments are filed; such records do not appear as filed as represented to the SEC and they

are not of file with NNVC's designated corporate representative agent in Reno, Nevada.

Plaintiff has made four (4) separate demands for inspection of corporate records. All four

of those demands have been ignored or resulted in an deficient production of documents

in violation of the statute mandating such disclosures. On October 3, 2011 (over a year

and a half prior to the filing of this action), Plaintiff, though its counsel, made a written

demand upon NNVC to produce all of its books and records for inspection within 20

days, including but not limited to all of the documents relating to the transactions set

forth above, the stock ledger and register, all minutes of the board of directors, all

documents showing the shareholder meetings and votes that have been conducted, and all

of the company's financial documents (the "October 3, 2011 Demand"). The written

demand was sent via certified mail and facsimile, and the facsimile was received by

counsel for NNVC during usual business hours on October 3, 2011. A true and correct

copy of the October 3, 2011 Demand is attached and incorporated hereto as Exhibit "H".

Plaintiff alleges that the October 3, 2011 Demand was indicia of Plaintiff's counsel's

power of attorney and complies with the requirements of the Nevada Revised Statutes

governing the procedures whereby a demand for inspection is to be made. By an email

dated October 11, 2011, counsel for NNVC responded that he would respond to the

demand "within the next several days." NNVC and its counsel subsequently failed to

tender any response to the October 3, 2011 Demand, including as promised by its counsel

on October 11, 2011. Further, on February 27, 2012, Plaintiff submitted to NNVC a

restated demand, accompanied by a Power of Attorney signed by Brian Bramell (President of CIMS Group, Inc., Plaintiff's principal) and an affidavit by Mr. Bramell concerning the use of certain information requested in Plaintiff's October 3, 2011 Demand. True and correct copies of these documents are collectively attached and incorporated hereto as Exhibit "I". NNVC and its counsel subsequently failed to tender any response to the February 27, 2012 Demand. Again, on March 22, 2012, Plaintiff submitted to NNVC a third demand for inspection of corporate records and request for corrective action (the "March 22, 2012 Demand"), accompanied by a Power of Attorney signed by Brian Bramell (President of CIMS Group, Inc., Plaintiff's principal) and an affidavit by Mr. Bramell concerning the use of certain information requested in Plaintiff's previous two demands. The March 22, 2012 Demand re-alleged and incorporated the substantive content of previous demand letters and demanded additional corrective action. NNVC and its counsel have failed to respond to the March 22, 2012 Demand. True and correct copies of these documents are collectively attached and incorporated hereto as Exhibit "J". Finally, on March 4, 2013, Plaintiff served NNVC with a fourth demand for inspection of corporate records (the "March 4, 2013 Demand"), accompanied by a Power of Attorney signed by Brian Bramell (President of CIMS Group, Inc., the general partner of Yidam, Ltd.) and an affidavit by Mr. Bramell concerning the use of certain information contained in Plaintiff's demand. The March 4, 2013 Demand was limited in its scope to only those documents that are identified in NRS 78.105.

Defendant NNVC did, at last, produce some of the documents required by NRS 78.105 but the production was deficient in that (a) the bylaws produced here undated and were amended but no reference to the original bylaws or their contents was produced; (b) no stock ledger was produced; instead, a statement of location of the stock ledger was produced. Further, on April 8, 2013, Plaintiff's representative presented himself at the location identified for the purposes of inspecting and copying the stock ledger (the offices of NNVC's appointed stock transfer agent). However, the stock transfer agent refused to permit Plaintiff's representative to inspect the stock ledger. **Upon information and belief, the only inference to be drawn from NNVC's persistent refusal to permit inspection of the stock ledger is that said document contains information that NNVC, Seymour and Diwan wish to conceal.** Either NNVC is lying to the SEC or to the State of Nevada and its shareholders. Neither alternative is acceptable.

13. **Violation of NNVC's Own Ethics Policy.** In the Company's very first filing with the SEC, Form 10-SM filed November 14, 2005, the Company attached its "Code of Ethics of Nanoviricides". That document identifies 9 items under the heading "All directors, officers and employees of the company will". The following is a list of those 9 items and a brief description of some of the ways these codes have been violated:

*1) Act with honesty and integrity, avoiding actual or apparent conflicts between personal and the interests of the Company, including refraining from receiving improper personal benefits as a result of holding a particular position with the Company;* Yet in a blatant

demonstration of apparent if not actual conflicts Defendants Diwan and TheraCour vote their significant position as the Company's largest shareholders to vote themselves lucrative contracts and compensation plans. *2) Not solicit or accept, for personal or other benefit, business or similar opportunities that could reasonably be expected to otherwise accrue to the benefit of the Company;* Yet Defendants Diwan and TheraCour divert valuable resources away from NNVC to develop drugs for the benefit of TheraCour and to which NNVC has no rights. *3) Where applicable, provide the U.S. Securities and Exchange Commission (the "Commission") and the public with complete, fair, accurate, timely and understandable disclosure in periodic reports and other documents filed or submitted to the Commission and in other public communications;* Yet in the first 24 quarters the Company has been in existence they have been forced to file a "Notification of inability to timely file" form on 21 occasions. In addition, the Company's own annual filings refer readers to attachments that do not exist in the SEC filings; most notably very important documents like Bylaws and Articles of Incorporation referenced to the 10-SM filed November 14, 2005. *4) Endeavor to comply with applicable laws and regulations of federal, state, local and foreign governments and government agencies having jurisdiction over the Company, and with applicable regulations of private or self-regulatory authorities having jurisdiction over the Company;* Yet Plaintiff has made four demands since October 2011 for inspection of corporate records upon the Company in accordance with Nevada law. Plaintiff is entitled to these documents as a matter of law

under NRS 78.105 but has been intentionally and systematically denied access to these documents. Plaintiff has been forced to sue Defendant NNVC in Nevada court to obtain those documents. *5) Act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts and strive to maintain independent judgment in the performance and fulfillment of their duties and responsibilities;* Yet for two years they falsely mislead investors, in numerous 10-K filings, to believe that Defendant TheraCour's Preferred "A" stock was convertible at a ratio of 2 for 1 when in fact the Preferred "A" stock was issued a conversion rate of 4 to 1. *6) Promote ethical behavior among subordinates and peers at the Company;* Yet the Company has a Scientific Advisory Board that is operating under false pretenses and where each and every member has refused to answer even basic written questions for Plaintiff about basic scientific protocol. *7) Use corporate assets entrusted to them in a responsible manner and refrain from competing directly or indirectly with the Company or using corporate information or opportunities for personal gain;* Yet Diwan directs NNVC to spend valuable resources developing drugs for TheraCour's benefit and then demands excessive benefits from NNVC for TheraCour (of which he owns 70%) to license those drugs. In addition, Diwan uses "cooperate opportunities" to purchase a building in the name of a LLC he controls and then diverts NNVC assets to design and build-out his asset. *8) Respect the confidentiality of information acquired or obtained in the course of performance of their responsibilities, never use confidential information for*

*personal advantage, and disclose confidential information of the Company or third*

*parties only when such disclosure is legally required or is otherwise authorized,* Yet the

Defendants routinely provide information to a blogger "Dr. Feelgood" that is not made

available to shareholders through proper disclosure. In addition, NNVC provided

confidential (i.e. insider) information to a Mr. Pat Cox. Mr. Cox writes a newsletter

called *Breakthrough Technology.* Upon information and belief, Mr. Cox obtained

information about future plans and opportunities of NNVC that were not disclosed to

NNVC's shareholders or the public at large. *9) Not fraudulently influence, coerce,*

*manipulate, mislead or fail to disclose relevant information to any auditor engaged in the*

*performance of an audit for the purpose of rendering the financial statements materially*

*misleading,* Plaintiff has no direct knowledge of a violation of this code. In short Plaintiff

can show examples of violations of 8 out of the 9 ethical codes that the Company has set

for itself. In the Company's latest 10-K filing they note under the section on conflicts that

"Currently, the Company does not have any policy in place to deal with such should such

a conflict arise." NNVC cites possible conflicts, yet admits NNVC DOES NOT HAVE

ANY POLICY for dealing with the conflicts. Disclosing potential conflicts without doing

anything to mitigate the conflict is a blatant breach of fiduciary duty. Upon information

and belief, Plaintiff alleges that NNVC has done nothing to mitigate these conflicts and in

fact block every attempt to determine if these conflicts are being abused.

## IV.

## DERIVATIVE ALLEGATIONS

14. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

15. Plaintiff brings this action for the benefit of NNVC to redress injuries suffered, and to be suffered, by NNVC as a result of the Defendants' conduct described above. NNVC is named solely as a nominal party to this action.

16. Plaintiff is and has been a shareholder of NNVC since 2007. Plaintiff will adequately and fairly represent the interests of NNVC in enforcing and prosecuting its rights. Plaintiff has a vested interest in the successful operation of NNVC as it is the owner of approximately 900,000 shares of NNVC stock and 500,000 warrants to purchase NNVC common stock. In addition Plaintiff's affiliates and Plaintiff's network of shareholders own significantly more than that amount. Contrary to allegations made and/or insinuated by NNVC, Plaintiff has no desire to harm NNVC, but rather seeks to improve the corporate governance and business judgment exhibited in governing NNVC.

17. Plaintiff has made demand upon NNVC for redress of the matters alleged herein in the form of written demands that are attached and incorporated as exhibits to this Complaint. Those demands have failed. Upon information and belief, Plaintiff also alleges that to the extent that the demands made herein exceed those articulated in the written demands upon NNVC, such demand would be futile given that the demands have

been directed to the very directors and/or officers whose actions and/or omissions give rise to the present action.

## V.

## FIRST CAUSE OF ACTION

## DEMAND FOR INJUNCTIVE RELIEF

18      Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

19.      Plaintiff believes and thereupon alleges that real and imminent risk of injury exists with respect to NVCC and its shareholders as a result of the acts and omissions alleged in this Complaint, specifically that unless specific actions are taken to ensure that NVCC is governed with transparency and full disclosure to its shareholders, the viability of the company and its success as a going venture is at risk.

20      Unless injunctive relief is granted on an expedited basis, Plaintiff and other NVCC shareholders will be irreparably harmed in that they will be powerless to inquire into the business activities of the company of which they are stockholders.

21.      Unless injunctive relief is granted, the risk of harm to NVCC and its shareholders outweighs whatever injury the proposed injunction will cause to Defendants.

22.      Plaintiff has no adequate remedy at law and thus requires an order this Court compelling the Defendants and NNVC to provide Plaintiff with access to the

documents identified in NRS 78.105 and, as discovery progresses in this matter, to all documents reasonably calculated to lead to the discovery of admissible evidence in this matter and removing Defendants Seymour and Diwan from their positions.

## VI.

## SECOND CAUSE OF ACTION

## BREACH OF THE DUTY OF GOOD FAITH, THE DUTY OF LOYALTY, AND FIDUCIARY DUTIES

23.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

24.     Defendants Seymour and Diwan owed NNVC and its shareholders duties of good faith, duties of loyalty and fiduciary duties arising out of their positions as directors and/or officers of NNVC.

25.     Defendants Seymour and Diwan breached their duty of good faith, the duty of loyalty, and breached their fiduciary duties as evidenced by the facts above and, as summarized, by the following:

a.     failing to act in good faith with a view to the best interest of NNVC, including a failure to act as a prudent person would with regard to his own business;

b.     failing to act loyally to NNVC's shareholders, putting his own person interests above the best interest of NNVC's shareholders;

c.      failing to competently, carefully and prudently advise the Plaintiffs and the Shareholders Group of all significant matters relating to NNVC's business, including fundamental changes to NNVC such as dilution of the shareholders' voting rights or transactions that constitute a material change to NNVC;

d.      repeatedly failing to competently, carefully, and prudently grant the Plaintiffs access to the corporate records and NNVC's financial records, and otherwise reasonably communicate with the shareholders;

e.      failing to act loyally and selflessly in relation to NNVC's shareholders;

f.      entering into relationships, obligations, transactions, businesses, or enterprises that conflicted or competed with the interests of NNVC and not disclosing the same to the shareholders;

g.      ignoring objectively better transactions for NNVC in favor of transactions that diluted the equity positions of NNVC shareholders unnecessarily and without any legitimate business reason; and

h.      ignoring objectively better transactions for NNVC in favor of transactions that furthered Defendant Diwan's personal interests.

26.     By reason of the matters aforesaid, Plaintiff seeks: (a) a court order appointing an independent expert to evaluate the transactions and the work-product/source documents pertaining thereto, (b) a court order removing Defendants Seymour and Diwan from their positions as directors and officers of NNVC; and (c) a

disgorgement of profits from Defendants Seymour and Diwan to the extent the transactions alleged herein are adjudicated as self-dealing. In addition, by reason of the matters aforesaid, the shareholders of NNVC have suffered loss and damage in an amount subject to proof, the particulars of which will be provided after full disclosure by Defendants Seymour and Diwan of all profits, gains, transactions and benefits that have accrued to Defendant Seymour and Diwan as a result of the actions and omissions alleged herein.

## VII.

## FOURTH CAUSE OF ACTION

## ACCOUNTING

27. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

28. Plaintiff requests an accounting of all transactions complained of herein , as well as all salary, profits, gains and benefits obtained by Defendants Seymour and Diwan as a consequence of the breaches of duties and obligations described herein.

## VIII.

## FIFTH CAUSE OF ACTION

## DECLARATORY RELIEF

29. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

**SHAREHOLDER DERIVATIVE COMPLAINT** – Page 42

30.    An actual controversy has arisen and now exists between the parties to this derivative proceeding concerning whether (a) the actions undertaken by NNVC (through Defendants Seymour and Diwan) violated the bylaws and other governing documents of the company; and (b) the transactions alleged herein constituted self-dealing by Defendants Seymour and Diwan and/or their assigns.

31.    Plaintiff desires a judicial determination of the aforementioned issues, and a declaration as to the legality of the actions undertaken as alleged herein.

32.    A judicial declaration is necessary and appropriate at this time under the circumstances in order to make the aforementioned determinations and to protect the rights of NNVC shareholders as a whole.

## IX.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants, namely:

a.    An immediate court order granting Plaintiff access to inspect the NNVC's records as mandated by NRS 78.105, and granting Plaintiff right to inspect, audit, and copy those records;

b.    Interim and final orders requiring Defendants Seymour and Diwan to be removed from their positions as directors and officers of NNVC;

c.      For any equitable relief to which Plaintiff may be entitled, including an order for accounting, tracing and constructive trust as well as a temporary restraining order, and preliminary and permanent injunctive relief;

d.      For consequential damages according to proof in a sum in excess of $75,000.00;

e.      For general and special damages, past and future, according to proof including but not limited to:

  i.      $12,000,000.00 relating to improper granting of shares to TheraCour;

  ii.     $2,500,000.00 in collateral and/or revenue granted in relation to the property leased by NNVC that, upon information and belief, has directly benefitted Defendant Diwan;

  iii.    $290,000,000.00 in lost shareholder equity as a result of failure by NNVC's to endure proper discharge of the individual Defendants' fiduciary duties to NNVC, and the individual Defendants' improper self-dealing, resulting in an approximately 80% loss of shareholder equity.

f.      For punitive damages according to proof in an amount sufficient to deter Defendants Seymour and Diwan from engaging in similar conduct against

Plaintiff or others and to deter Defendants Seymour and Diwan from engaging in similar malicious, offensive and fraudulent conduct against others in the future;

    g.    For costs and reasonable attorney's fees; and

    h.    For such other and further relief as the Court deems just and proper.

Dated: July 5, 2013.

Lindsey Parlin
Colorado Attorney Registration No. 42602
MARSH, PARLIN & ASSOCIATES
Attorneys and Counselors at Law

LINDSEY PARLIN
600 17TH STREET, SUITE 2800 SOUTH
DENVER, COLORADO 80202
(303) 500-3112 (Tel.)
(303) 416-4430 (Fax)

ANGELO L. ROSA
1168 E. 1700 S.
SALT LAKE CITY, UTAH 84105
(801) 440-4400 (Tel.)
(801) 415-1733 (Fax)
alrcims@gmail.com
(*pro hac vice pending*)

**Attorneys for Plaintiff**